UNITED STATES v. SOUTHERN PAC. R. CO. et al. (three cases).

(Circuit Court, S. D. California. April 10, 1899.)

Nos. 587, 662, and 675.

1. PUBLIC LANDS — GRANT TO SOUTHERN PACIFIC RAILROAD COMPANY — SCOPE OF GRANT OF 1871.

Under the act of March 3, 1871 (16 Stat. 573), incorporating the Texas Pacific Railroad Company, and making a grant of lands thereto, and by section 23 of which a grant was also made to the Southern Pacific Railroad Company for the building of a connecting line, subject to the proviso that such grant should "in no way affect or impair the rights, present or prospective, of the Atlantic & Pacific Railroad Company, or any other railroad company," such proviso excluded from the latter grant all lands to which, at the time the Southern Pacific Company filed the map of the definite location of its connecting line, the Texas Pacific Company had acquired any prospective rights under the same act, either by the filing of the map of its general route, on which the lands within the limits of its primary grant were withdrawn from the market by an executive order, or because they fell within the primary or indemnity limits of its grant on the definite location of its line, if such definite location was ever legally made.

2. SAME — GRANT TO TEXAS PACIFIC COMPANY — LOCATION OF LINE IN CALIFORNIA.

The act of March 3, 1871 (16 Stat. 573), incorporating the Texas Pacific Railroad Company, and making it a grant of lands to aid in the construction of its road, after fixing the location of its road, in general terms, from Marshall, Tex., to a point on the Colorado river near the southeastern boundary of California, provided that it should be constructed thence by the most direct and eligible route to San Diego, "pursuing in the location thereof as near as may be the thirty-second parallel of north latitude." The supplementary act of March 2, 1872 (17 Stat. 59), required the company, among other things, to "commence the construction of its road from San Diego eastward," building not less than a specified number of miles each year. A map of its general route was filed by the company, corresponding practically with the provisions of said acts. No part of the road was ever built in California, nor was any map of its definite location within that state filed; and in 1885 the grant was declared forfeited by congress. *Held,* that the selection by the company of a definite line running from Yuma, on the Colorado river, in a northwesterly direction, to the summit of San Gorgonio Pass, near the thirty-fourth parallel, thence southwesterly to the coast, and thence south along the coast 40 miles to San Diego, even if so made as to constitute a definite location of the line of its road, was not of a line authorized by the acts of congress, and did not operate to give the company, under such acts, any prospective rights in the public lands adjacent to such line.

3. SAME.

The action of the board of directors of the Texas Pacific Railroad Company in 1872 in passing a resolution adopting a line reported on by the chief engineer, between Yuma, on the Colorado river, and San Diego, as the route between such points, "with such modifications as in the judgment of the president may be to the best interests of the company," did not constitute a definite location of the road, nor did a statement in the annual report of the president to congress, made in accordance with the requirement of the company's charter, that "the route of the road has been definitely fixed"; and evidence that other routes were in contemplation, and other surveys made, as late as 1877, establishes the fact that no definite location of that part of the line was ever made.

These were three suits by the United States against the Southern Pacific Railroad Company and others to determine the title to certain lands, which were consolidated and tried together.

The Attorney General and Joseph H. Call, Sp. Asst. U. S. Atty. Wm. Singer, Jr., Page, McCutchen & Eells, and Wm. H. H. Hart, for defendants.

ROSS, Circuit Judge. The complainant instituted three suits in this court, numbered, respectively, 587, 662, and 675, the object of which was the determination of the title to those odd-numbered sections of land within the 20 and 30 mile limits of the grant made by the United States to the Southern Pacific Railroad Company by the act of congress of March 3, 1871, which are also within 20 miles of the general route of the Texas Pacific Railroad Company, as indicated by its map thereof filed in the office of the secretary of the interior, or within 30 miles of the asserted definite location of the Texas Pacific Railroad from Yuma, on the Colorado river, by way of San Gorgonio Pass, to San Diego, Cal.; to cancel such patents as had theretofore been issued therefor by the government to the Southern Pacific Railroad Company under the grant of March 3, 1871; and to quiet the complainant's title to all of the lands referred to. In each of the suits, issue was joined by the defendants, and certain testimony taken therein. At that stage of the proceedings the court, upon the stipulation of the respective parties, made an order consolidating the suits, with leave to the complainant to file an amended and supplemental bill (the parties stipulating that the testimony theretofore taken should, so far as applicable, be used in the consolidated case), and with leave to the respective parties to give such further evidence as they might elect. Thereafter, and on May 26, 1896, the complainant filed its amended and supplemental bill, upon which issue was joined by the defendants thereto, and additional evidence introduced by the respective parties. The complainant thereafter dismissed the suit in so far as concerned all of the lands mentioned for which patents had theretofore been issued by the government, except about 5,000 acres, which the Southern Pacific Railroad Company contracted to sell and convey to the defendant Colorado River Irrigation Company. So that the case, as submitted, involves those 5,000 acres, and all of the unpatented odd-numbered sections of land embraced within the primary and indemnity limits of the Southern Pacific Company's grant of March 3, 1871, that are also within 20 miles of the general route of the Texas Pacific Company, as indicated by its map thereof filed in the general land office, or within 30 miles of the asserted definite location of the Texas Pacific Railroad from Yuma, by way of San Gorgonio Pass, to San Diego.

The grant to the Southern Pacific Company was made by section 23 of the act entitled "An act to incorporate the Texas Pacific Railroad Company, and to aid in the construction of its road, and for other purposes." 16 Stat. 573. The act provided for the incorporation of the Texas Pacific Railroad Company, and authorized and empowered it to "lay out, locate, construct, furnish, maintain, and enjoy a continuous railroad and telegraph line, with the appurtenances, from a point at or near Marshall, county of Harrison, state of Texas; thence by the most direct and eligible route, to be determined by

said company, near the thirty-second parallel of north latitude, to a point at or near El Paso; thence by the most direct and eligible route, to be selected by said company, through New Mexico and Arizona, to a point on the Rio Colorado, at or near the southeastern boundary of the state of California; thence by the most direct and eligible route to San Diego, California, to ship's channel, in the Bay of San Diego, in the state of California, pursuing in the location thereof, as near as may be, the thirty-second parallel of north latitude." By section 9 of the act, congress, for the purpose of aiding in the construction of the railroad and telegraph line thus authorized, granted to the Texas Pacific Railroad Company, its successors and assigns, "every alternate section of public land, not mineral, designated by odd numbers, to the amount of 20 alternate sections per mile on each side of said railroad line, as such line may be adopted by said company, through the territories of the United States, and 10 alternate sections of land per mile on each side of said railroad in California, where the same shall not have been sold, reserved, or otherwise disposed of by the United States, and to which a pre emption or homestead claim may not have attached at the time the line of said road is definitely fixed." The act further provided that in case any of the said lands shall have been sold, reserved, occupied, or pre-empted, or otherwise disposed of, other lands shall be selected in lieu thereof by the company, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than 10 miles beyond the limits of said alternate sections first above named, and not including the reserved numbers. It also declared that "if, in the too near approach of said railroad line to the boundary of Mexico, the number of sections of land to which the company is entitled cannot be selected immediately on the line of said railroad, or in lieu of mineral lands excluded from this grant, a like quantity of unoccupied and unappropriated agricultural lands, in odd-numbered sections, nearest the line of said railroad, may be selected as above provided," with other provisions not necessary to be stated. By section 12 of the act, it was provided that whenever the Texas Pacific Company shall complete the first and each succeeding section of 20 consecutive miles of the railroad authorized, and put the same in running order as a first-class road in all its appointments, it shall be the duty of the secretary of the interior to cause patents to be issued, conveying to the company the number of sections of land opposite to and coterminous with such completed road to which it shall be entitled for each section so completed. By section 12 it was also provided that the Texas Pacific Company, within two years after the passage of the act, should designate the general route of its said road, as near as may be, and shall file a map of the same in the department of the interior, and that when that map is so filed the secretary of the interior, immediately thereafter, shall cause the lands within 40 miles on each side of said designated route within the territories, and 20 miles within the state of California, to be withdrawn from pre-emption, private entry, and sale. Section 23 of the same act is as follows:

"That for the purpose of connecting the Texas Pacific Railroad with the city of San Francisco, the Southern Pacific Railroad Company of California is hereby authorized (subject to the laws of California), to construct a line of railroad from a point at or near the Tehachepa Pass, by way of Los Angeles, to the Texas Pacific Railroad at or near the Colorado river, with the same rights, grants, and privileges, and subject to the same limitations, restrictions, and conditions, as were granted to said Southern Pacific Railroad Company of California by the act of July 27th, 1866; provided, however, that this section shall in no way affect or impair the rights, present or prospective, of the Atlantic & Pacific Railroad Company, or any other railroad company."

The act of July 27, 1866, is the act by which congress created the Atlantic & Pacific Railroad Company, with authority to construct and maintain a line of railroad and telegraph from a point at or near Springfield, Mo., to the western boundary line of that state; thence by the most eligible railroad route, to be determined by the company, to the Canadian river; thence to Albuquerque, on the river Del Norte; thence by way of Agua Frio, or other suitable pass, to the head waters of the Colorado Chiquito; thence along the thirty-fifth parallel of latitude, as near as might be suitable for a road route, to the Colorado river, at such point as might be selected by the company for crossing, and "thence by the most practicable and eligible route to the Pacific,"—in aid of the construction of which road congress granted to the Atlantic & Pacific Company every odd-numbered section of public land, not mineral, to the amount of 20 alternate sections per mile on each side of such line as the company might adopt through any territory of the United States, and 10 alternate sections per mile on each side of the line through any state, to which the United States had full title, and not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of said road is designated by a plat thereof filed in the office of the commissioner of the general land office. 14 Stat. 292. By the eighteenth section of the act of July 27, 1866, the Southern Pacific Railroad Company was authorized to connect with the Atlantic & Pacific Railroad at such point near the boundary line of this state as it deemed most suitable for a railroad line to San Francisco; and to have a uniform gauge and rate of fare with that road, and in consideration thereof, to aid in its construction, "shall have similar grants of land, subject to all the conditions and limitations herein provided, and shall be required to construct its road on like regulations as to time and manner, with the Atlantic & Pacific Railroad herein provided for." On the 2d day of March, 1872, congress passed an act supplementary to that of March 3, 1871, by which the name of the Texas Pacific Railroad Company was changed to "The Texas & Pacific Railway Company," and which, after providing for the issuance, and filing and recording in the department of the interior, of certain bonds and mortgages by that company, and providing that the road should be constructed with iron or steel rails manufactured from American ore, except such as may have been contracted for before consolidation by any railroad company which may be purchased by or consolidated with the grantee company, declared, in section 5 thereof, that the Texas

& Pacific Railway Company should commence the construction of its road at or near Marshall, Tex., and should proceed with its construction on the line authorized by the original act, and so prosecute the same as to have at least 100 consecutive miles of railroad from Marshall, Tex., completed and in running order within two years thereafter, and so continue to construct, each year thereafter, a sufficient number of miles, not less than 100, to secure the completion of the whole line within 10 years after the passage of the supplemental act, with a further provision that the company should "commence the construction of said road from San Diego eastward within one year from the passage of this act, and construct not less than 10 miles before the expiration of the second year, and after the second year not less than 25 miles per annum in continuous line thereafter between San Diego and the Colorado river until the junction is formed with the line from the east at the latter point, or east thereof; and upon failure to so complete it, congress may adopt such measures as it may deem necessary and proper to secure its speedy completion." 17 Stat. 59. On February 28, 1885, an act of congress was approved declaring forfeited all of the lands granted to the Texas & Pacific Company, and the whole thereof "restored to the public domain and made subject to disposal under the general laws of the United States as though said grant had never been made." 23 Stat. 337.

From this brief review of the congressional legislation upon the subject, it will be seen that the grant to the Southern Pacific Railroad Company of March 3, 1871, in aid of the road it was thereby authorized to construct, was of such lands within the designated limits to which the United States had full title, and which were not reserved, sold, granted, or otherwise appropriated, and as were free from pre-emption or other claims or rights at the time the line of its road should be designated by a plat thereof filed in the office of the commissioner of the general land office. That grant, as has also been seen, was accompanied with the further provision that it should "in no way affect or impair the rights, present or prospective, of the Atlantic & Pacific Railroad Company, or any other railroad company." We are therefore to inquire whether the Atlantic & Pacific or any other railroad company had acquired any present or prospective right to any of the lands in suit, and, if so, to which of said lands, and, further, whether any of the lands in suit, and, if so, which of them, were reserved to the United States, or to which any other right or claim had attached, at the time of the filing in the general land office by the Southern Pacific Railroad Company of its map of the definite location of the road authorized to be built by it by section 23 of the act of March 3, 1871.

As the grants to the Southern Pacific and the Texas Pacific Railroad Companies were made by the same act and of the same date, the usual rule would give to each company one-half of such lands as fell within both grants. But the present case is taken out of the ordinary rule, as was expressly decided by the supreme court in the case of U. S. v. Colton Marble & Lime Co., 146 U. S. 615, 616, 13 Sup. Ct. 163, 164, by the proviso annexed to the grant to the Southern

Pacific Company, respecting which proviso the supreme court, in the case last cited, said:

"It cannot be supposed that this proviso was meaningless, and that congress intended nothing by it. Carefully inserted, in a way to distinguish this grant from ordinary later and conflicting grants, it must be held that congress meant by it to impose limitations and restrictions different from those generally imposed in such cases, and it in substance declared that the Southern Pacific Company should not in any event take lands to which any other company had at the time a present or prospective right."

Proceeding in the case cited, the supreme court said:

"What were the prospective rights of the Atlantic & Pacific Company? Of course, it could not be known at the time of the passage of the latter act exactly where the lands of the two companies would be located, and where the point of crossing would be. Neither could it then be known that there would be any deficiency in the granted lands at the point of crossing, or that, if such deficiency existed, it would require all the indemnity lands to make good the loss. It might well be assumed that very likely the Atlantic & Pacific Company would be called upon to select from the indemnity lands a portion sufficient to make good the deficiency in the granted limits. That right of selection was a prospective right, and, if it was to be fully exercised, no adverse title could be created to any lands within the indemnity limits. Suppose, for instance, it should turn out that only half of the indemnity lands were necessary to make good the deficiency, and that one-half of such lands were well watered and valuable, while the remainder were arid and comparatively valueless; obviously the right of selection would be seriously impaired if it were limited to only the arid and valueless tracts. In fact, every withdrawal of lands from the aggregate of those from which selection could be made would more or less impair the value of the right of selection. The only way in which force can be given to this proviso is to hold that the indemnity lands of the Atlantic & Pacific were exempted from the grant to the Southern Pacific; for, if not exempted, the former company's prospective right of selection would be to that extent impaired."

The court was here speaking of the conflicting claims of the Southern Pacific and Atlantic & Pacific Railroad Companies, but as the proviso to the Southern Pacific grant also includes the "present or prospective" rights of "any other railroad company," it is obvious that the decision of the supreme court in the case cited is equally applicable to the conflicting claims of the Southern Pacific and Texas & Pacific Companies, and that, under that decision, any lands to which the Texas & Pacific Company had a present or prospective right at the time of the filing in the general land office by the Southern Pacific Company of its map of the definite location of the road it was authorized to build by section 23 of the act of March 3, 1871, were excluded from the grant thereby made. And as whatever rights the Texas & Pacific Company ever acquired to any of the lands in question continued to exist until the act of forfeiture passed by congress February 28, 1885, and as long before that time the Southern Pacific Company had built the road it was authorized to construct, and filed in the general land office maps showing its definite location, it follows that if at the latter date the lands in suit, or any of them, were for any reason reserved, or were lands to which the Texas & Pacific Company had acquired a present or prospective right, such lands did not pass to the Southern Pacific Company under its grant.

The case shows that the Texas & Pacific Railroad Company filed

in the office of the secretary of the interior a map of the general route of its road on the 15th day of October, 1871, which map was accepted and approved by the secretary of the interior, and that thereupon an executive order was made, withdrawing, for the benefit of that company, all of the public lands in California, designated by odd numbers, falling within 20 miles on either side of that line of its road. To all of such public lands the Texas & Pacific Company certainly had a "prospective," if not a "present," right, under the decision of the supreme court in U. S. v. Colton Marble & Lime Co., supra. This 20-mile limit from the line of the general route of the Texas & Pacific Company, however, includes but a small part of the lands in controversy. The main contention in the case relates to those lands within the primary and indemnity limits of what the complainant contends was the definite location of the line of route of the Texas & Pacific Company, extending from Yuma, by way of the San Gorgonio Pass, to San Diego. On the part of the defendants it is insisted that the Texas & Pacific Company never had the right to locate or build any road from Yuma to San Diego by way of the San Gorgonio Pass, and that, if it ever had such right, it never in fact definitely located any such road.

That the Texas & Pacific Company never built the road authorized by congress is conceded. It was for that reason that congress, on the 28th day of February, 1885, declared forfeited the grant it had theretofore made in behalf of that company. Recurring to the act of March 3, 1871, it is seen that the road the Texas & Pacific Company was authorized to build, and in aid of which that company's grant was made, was a road extending from Marshall, Tex., by the most direct and eligible route, to be determined by said company, near the thirty-second parallel of north latitude, to a point at or near El Paso; thence by the most direct and eligible route, to be selected by said company, through New Mexico and Arizona, to a point on the Colorado river at or near the southeastern boundary of the state of California; thence by the most direct and eligible route to ship's channel in the Bay of San Diego, Cal., "pursuing in the location thereof, as near as may be, the thirty-second parallel of north latitude." It is thus seen that congress left it to the Texas & Pacific Company to determine the most direct and eligible route between Marshall, Tex., and a point at or near El Paso, and that it also left to that company the determination of the most direct and eligible route from the latter point, through New Mexico and Arizona, to a point on the Colorado river at or near the southeastern boundary of the state of California; but from this latter point congress saw proper to limit the discretionary power of the Texas & Pacific Company, and itself declared that, from the point the Texas & Pacific Company should locate on the Colorado river, the road should be extended by the most direct and eligible route to ship's channel in the Bay of San Diego, "pursuing in the location thereof, as near as may be, the thirty-second parallel of north latitude." And in the supplementary act of March 2, 1872, congress, as has been seen, not only provided for the speedy commencement of the road at Marshall, Tex., and for its continuous

94 F.—28

prosecution and construction from that point "on the line authorized by the original act," but also provided that the company should "commence the construction of said road from San Diego eastward, within one year from the passage of this act, and construct not less than 10 miles before the expiration of the second year, and after the second year not less than 25 miles per annum in continuous line thereafter between San Diego and the Colorado river, until the junction is formed with the line from the east at the latter point, or east thereof; and upon failure to so complete it, congress may adopt such measures as it may deem necessary and proper to secure its speedy completion."

In 1872 and 1873 the Texas & Pacific Company surveyed various lines between the Colorado river and the bay of San Diego. At that time Gen. G. M. Dodge was chief engineer of the company, and J. A. Evans and Joseph U. Crawford were two of its division engineers. The result of those surveys was embodied by the chief engineer in a report made by him to the president of the company on the 12th day of March, 1873. That report is, in part, as follows:

"Office of the Chief Engineer.

"Marshall, Texas, March 12th, 1873.

"Hon. Thomas A. Scott, President—Dear Sir: I have the honor to submit a preliminary report upon the surveys on the California Division between San Diego & Colorado river, with a view of determining the route for adoption over that division. The full report of all the surveys, with maps, profiles, &c., will be made up by Mr. Evans hereafter; but, from data forwarded to me by him, I am able to place before the board sufficient information for them to determine upon the general route from San Diego east.

"The lines examined are as follows: The direct line from San Diego to Ft. Yuma, known as the 'Otay Valley Line,' $203 \, 11/100$ miles long. The San Gorgonio Pass lines, numbered 1 to 4, marked 'Main Line,' and 'A, B, C, D,' on maps. No. 1. Main line, 313 miles long. No. 2. The coast line, via Temecula creek to the main line; thence by main line to the pass,—$308 \, 73/100$ miles. No. 3. The coast line to Temecula; thence the main line to La Laguna; thence up the San Jacinto river & San Bernardino,—302 miles. No. 4. The coast line; thence Temecula creek; thence line D direct to San Gorgonio Pass,—270 miles. Warner's Pass line was not examined; our reconnoisance of it showing that it was impracticable, as compared with other lines.

"The prominent features of each line are:

"First, direct line crosses a barren, uninviting country, hanging to steep and perpendicular slopes, stubborn to overcome, and crossing valleys & ravines hundreds of feet high, passing the summit of the Sierra Nevadas at Walker's Summit, thence down Carissa Cañon to the desert, and thence to the Colorado at Fort Yuma. As an evidence of the character of the Carissa Cañon on the direct line, $7\frac{1}{2}$ miles of that work is estimated to cost $240,000 per mile. The Carissa Cañon is reported as very heavy work; the crossing of the streams & ravines requiring nearly 7,000,000 feet of timber and 600 feet Howe truss bridging, which must be built, as earth excavation cannot be found to fill the chasms. It also has eleven tunnels in eleven miles. It has $57 \, 18/100$ miles from 80 to 116 ft. maximum grade, and $11 \, 61/100$ miles of 116 ft. grade. The ascent and descent to this line is 9,032 feet. After reaching the desert, lines cross the sand hills, composed of shifting said, often changing miles in a single season. It is considered that if we take this route we will have to avoid these hills, either by the south, which would take us into Mexico, or by the north, which would increase the distance some 18 miles. The distance upon the line as surveyed is $203.11/100$ miles. Locally, this is the line that is most desired by the people of San Diego. It is the shortest line on the surface, and would have the least mileage to operate. It strikes the Bay of San Diego direct from the east, and would be the shortest line across the continent; but, equated and reduced to level grade, and compared with San Gorgonio Pass lines, it is

the longest line from Fort Yuma to San Diego. The estimates upon it have been made as closely as practicable, considering the nature of the country. It is impossible, upon such grade, to cover all contingencies, but estimates have been made as grades show on profile. Mr. Evans thinks that his estimate covers the cost of the line. Upon the location of this line, it is my opinion, if we are forced to keep clear of the sand hills, the distance will be increased to 220 miles. In competition with this line we have the lines known as the 'San Gorgonio Pass Lines,' two of which are distinct lines to San Gorgonio Pass; the others being parts of each of those lines. They are known as the 'Main Line' and 'Coast Line.' From San Gorgonio Pass to Fort Yuma all are a common line.

"No. 1. The main line commences at San Diego; follows a short distance up the San Diego river; thence across the drainage of the country to Temecula creek; thence by Temecula & La Laguna to the Rio de Santa Ana, and up that stream to the San Bernardino Valley; thence to San Gorgonio Pass. This is the longest of all the San Gorgonio Pass lines, & has the greatest ascent and descent, obtaining it in crossing the drainage from San Diego to Temecula, and will not, as a whole, come into comparison with some of the other lines. That portion of it from Temecula to the Santa Ana river, and thence by San Bernardino and San Gorgonio Pass, gives us the best connection with Los Angeles, gives us the best connection north. This line is 313 miles long.

"No. 4. The next line, known as the 'Coast Line,' and numbered 4, follows the coast from San Diego to the mouth of Temecula creek; thence up Temecula Creek to Temecula; thence, by line D, direct to San Gorgonio Pass. This line is the shortest of the San Gorgonio Pass Lines, and, as I calculate the cost, is the cheapest, though Mr. Evans makes the construction of it, proper, cost a little more than line 3. This line is the proper line to adopt from San Diego to Temecula, provided the San Gorgonio Pass route is taken. From Temecula to the San Gorgonio Pass we have examined 4 lines, and the examination reduces us to the choice of two. This direct coast line has an elevation and depression of 8,133 feet; has $28 \frac{44}{100}$ miles maximum grade 80 to 105 feet. It is least in curvature, and, in a solely engineering point of view, is the best of all the lines examined. When equated to a level grade, it is 50 miles shorter than Otay Valley direct line.

"No. 3 line is the same as the coast line to Temecula; thence runs by La Laguna; thence by San Jacinto river, by line B to Riverside & San Bernardino; thence San Gorgonio Pass, $122 \frac{22}{100}$ miles. The great difficulty of overcoming the country between La Laguna and the San Jacinto, and up that river, throws it out of the comparison. It is mentioned here for the purpose of showing that we have thoroughly examined that country.

"Line No. 2 is the same as the coast line to Temecula; thence the same as the main line to San Gorgonio Pass, passing the La Laguna to the Rio de Santa Ana through San Bernardino to the pass. By examining the tables of cost, grades, & distances, you will see that the decision upon the lines lies between this line and line D and the direct line by the Otay Valley. If we aim for a connection with Los Angeles, this line will give it to us better than line D. If we regard Los Angeles and Temecula as fixed points, the distances would compare as follows:

Temecula to the pass, line D.................................. 40 miles
Los Angeles to San Bernardino.............................. 54  "
San Bernardino to pass..................................... 18  "

Total ...................................................... 112 miles

"This is with a view of taking the produce of Los Angeles to San Diego, and it would run from Los Angeles to San Bernardino; then to San Gorgonio Pass; thence down line D to San Diego.

From Temecula to Los Angeles via main line.................... 74 M
Temecula to Temecula Pass.................................... 44  "

Total ...................................................... 118

—making it six miles longer. To overcome this six miles, we make the elevation to San Gorgonio Pass on this line but once, while on line D it is made

twice. It would have to be done on both lines, provided the intersections were made at the summit instead of at Temecula. I submit tables of grades & of the cost of the lines, as obtained from the estimates of Mr. Evans."

Embodied in this report were estimates of Division Engineer Evans showing the cost of the line by way of Otay Valley to be $12,441,-706.97, and the cost of the line by way of San Gorgonio Pass to be $6,441,706.97.

This report of the chief engineer having been by the president of the company submitted to its board of directors, that board on April 4, 1873, adopted this resolution:

"On motion it was resolved that the line by San Gorgonio Pass, known as 'Number 4,' be, and the same is hereby, adopted as the route from San Diego, with such modifications as in the judgment of the president may be to the best interests of the company."

In May, 1874, Gen. Dodge, as chief engineer, in a report to the company, thus described the line of road from Yuma to San Diego:

"Beginning at Fort Yuma: From there the line runs in a northwesterly direction, passing to the north of the sand hills and across the Salt Lake district of the Colorado desert of California, over which our line for 45 miles is below sea level; the lowest point being 290 feet below tide water. In crossing this, the line passes on the north margin of the Salt Lake of the Colorado desert. Leaving the mud volcanoes about five miles to the south, and the Dos Palmos stage station about the same distance to the north, we reach the Cabazon Valley, 113 miles from Ft. Yuma; thence on nearly the same course, 50 miles, to the summit of San Gorgonio Pass, running 1¼ miles south of White Water stage station, and one mile south of Devontine's ranch; reaching the summit 2½ miles south of Edgar's ranch. This pass is 2,621 feet above tide water, and its small elevation must be considered remarkable, as it lies between the San Bernardino and San Jacinto Mountains, the highest peaks of the range. Leaving San Gorgonio Pass, our course is southwest, passing down one of the tributaries of the San Jacinto, which is known as the 'Potrero' (or 'Pocket') 'of the San Jacinto,' to the San Jacinto Plains and Temecula Plains (these plains lie between the main range and the Santa Ana range), and down the Temecula Plains to the head of Temecula Cañon, and down the cañon where the Temecula breaks through the Santa Ana range, 10 miles to the open valley, striking the coast near the Santa Margarita ranches, about 40 miles north of San Diego; then south and down the coast on the western slope of the Soledad Mountains, crossing the Soledad, San Luis Rey, San Dieguito, the ravine of the La Jolla, skirting False Bay; then to the shore of San Diego Bay, and along the shore of the bay to the depot grounds of the Texas Pacific Railway below the Pacific Steamship Company's wharf. Distance from the Pima villages on the Gila river, 444.4 miles."

It is this line that the complainant claims is the line of definite location of the Texas & Pacific Company. Assuming, for the present, that the line thus described was definitely located, we proceed to inquire whether it was the line authorized to be built by the Texas & Pacific Company by the acts of congress in question.

It is not denied that the Otay line, referred to in the report of the chief engineer of the Texas & Pacific Company made on the 12th day of March, 1873, is the direct line between Yuma and San Diego, and approximately corresponds with the map of general route filed by that company in the office of the secretary of the interior. It pursues, too, "as near as may be," the thirty-second parallel of north latitude, approaching within a few miles the boundary line between the United States and Mexico. The line of route described by the

chief engineer of the company in his report of May, 1874, and contended on the part of the complainant to be the line definitely located by the company, starts at Yuma, and runs in a northwesterly direction, 163 miles, to the summit of San Gorgonio Pass (about the thirty-fourth parallel of north latitude), and runs thence southwesterly to the Pacific Coast, and thence south 40 miles down the coast to the Bay of San Diego. It is thus seen that this line, so far from pursuing, as near as may be, the thirty-second parallel of north latitude from Yuma to San Diego, and running eastward from San Diego, as congress explicitly declared it should do, runs north from San Diego a distance of 40 miles, and thence northeasterly until it practically reaches the thirty-fourth parallel of north latitude. Not only so, but from San Gorgonio Pass to Yuma, it practically parallels the other road which the very same act of congress provided should connect, at or near the Colorado river, with the Texas & Pacific road authorized to be built. It seems entirely clear to me that the Texas & Pacific Company was not authorized to locate or build any such road. It was not the road contemplated by congress. It was not the road indicated upon the map of general route filed by that company in the office of the secretary of the interior, which map, so far as appears, was the only map that company ever did file in the general land office indicating any line between Yuma and San Diego. Congress, as the acts in question plainly show, provided for two railroads west of the Colorado river, and provided for their junction at or near that river,—one, the Texas & Pacific, to extend from that point of junction westward, by the most direct and eligible route, pursuing, as near as may be, the thirty-second parallel of north latitude to ship's channel, in the Bay of San Diego; and the other, the Southern Pacific, to connect therewith at or near the Colorado river, and to build from that point, by way of Los Angeles (necessarily through the San Gorgonio Pass), to a point at or near the Tehachepi Pass; the declared purpose being to thereby connect the Texas & Pacific Railroad with the city of San Francisco. In this respect the act under consideration is much like the Northern Pacific act of July 2, 1864 (13 Stat. 365). By that act the Northern Pacific Railroad Company was incorporated, with authority to construct and to maintain a continuous railroad and telegraph line—

"Beginning at a point on Lake Superior in the state of Minnesota or Wisconsin, thence westerly by the most eligible railroad route as shall be determined by said company within the territory of the United States, on a line north of the forty-fifth degree of latitude, to some point on Puget Sound, with a branch via the valley of the Columbia River to a point at or near Portland, in the state of Oregon, leaving the main trunk line at the most suitable place not more than three hundred miles from its western terminus."

In aid of that line certain lands were by the act granted to the Northern Pacific Company. By a joint resolution of congress approved April 10, 1869, it was provided that—

"The Northern Pacific Railroad Company be, and hereby is, authorized to extend its branch line from a point at or near Portland, Oregon, to some suitable point on Puget Sound to be determined by said company, and also to connect the same with its main line west of the Cascade Mountains, in the territory of Washington; said extension being subject to all of the conditions and

provisions, and said company, in respect thereto, being entitled to all the rights and privileges conferred by the act incorporating said company, and all acts additional to and amendatory thereof: provided, that said company shall not be entitled to any subsidy in money, bonds, or additional lands of the United States in respect to said extension of its branch line as aforesaid, except such lands as may be included in the right of way on the line of such extension as it may be located: and provided further, that at least twenty-five miles of said extension shall be constructed before the second day of July, eighteen hundred and seventy-one, and forty miles per year thereafter, until the whole of said extension shall be completed." 16 Stat. 57.

On the 4th day of May, 1870, congress, for the purpose of aiding in the construction of a railroad and telegraph line from Portland to Astoria, and a suitable point of junction near Forest Grove to the Yamhill river, near McMinnville, in the state of Oregon, granted to the Oregon Central Railroad Company, a corporation of Oregon, then engaged in constructing said road, and to their successors and assigns, a right of way, etc., and also certain lands, which company accepted the grant, and on the 31st of January, 1872, filed its map of definite location of a proposed line of road from Astoria to Castor creek, near Forest Grove. On the 31st day of May, 1870, congress passed a joint resolution providing—

"That the Northern Pacific Railroad Company be, and hereby is, authorized * * * to locate and construct, under the provisions, and with the privileges, grants, and duties provided for in its act of incorporation, its main road to some point on Puget Sound, via the valley of the Columbia river, with the right to locate and construct its branch from some convenient point on its main trunk line across the Cascade Mountains to Puget Sound; and in the event of there not being in any state or territory in which said main line or branch may be located at the time of the final location thereof, the amount of lands per mile granted by congress to said company, within the limits prescribed by its charter, then said company shall be entitled, under the directions of the secretary of the interior, to receive so many sections of land belonging to the United States, and designated by odd numbers, in such state or territory, within 10 miles on each side. of said road, beyond the limits prescribed in said charter, as will make up such deficiency, on said main line or branch, except mineral and other lands as excepted in the charter of said company of eighteen hundred and sixty four, to the amount of the lands that have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of subsequent to the passage of the act of July 2, 1864. And that 25 miles of said main line between its western terminus and the city of Portland in the state of Oregon, shall be completed by the first day of January, Anno Domini eighteen hundred and seventy two, and forty miles of the remaining portion thereof each year thereafter until the whole shall be completed between said points." 16 Stat. 378.

In the case of U. S. v. Northern Pac. R. Co., 152 U. S. 284, 292, 14 Sup. Ct. 598, 601, the question arose whether the act of July 2, 1864, contained a grant of lands in aid of the construction by the Northern Pacific Railroad Company of a railroad and telegraph line from Portland to Puget Sound.

The court said:

"Although that act allowed the company to adopt the most eligible route within the territory of the United States north of the forty-fifth degree of latitude, it is clear that congress contemplated the construction of a main trunk line between Lake Superior and Puget Sound, which would not touch any point 'at or near Portland,' and the western end of which would be east and northeast of a direct line between Portland and Puget Sound, and, in addition, a branch line leaving the main trunk line at some suitable place not more than

three hundred miles from its western terminus, and extending 'via the valley of the Columbia river to a point at or near Portland.' If the main line, as originally indicated by the act of 1864, had been established on the route between Portland and Puget Sound, the branch line could not have left the main line at some point not more than three hundred miles from its western terminus, and extended via the valley of the Columbia river to a point at or near Portland. The authority given to the company to adopt the most eligible route did not authorize it. by a map of general route, to cover an unlimited extent of country north of the forty-fifth degree of latitude. On the contrary, as said in St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 13, 11 Sup. Ct. 389, 393, 'When the termini of a railroad are mentioned, for whose construction a grant is made, the extent of which is dependent upon the distance between those points, the road should be constructed upon the most direct and practicable line. No unnecessary deviation from such line would be deemed within the contemplation of the grantor, and would be rejected as not in accordance with the grant.' "

Not only do I think that the Texas & Pacific Company was not authorized to locate or build any road through the San Gorgonio Pass, but I am also of opinion that the evidence in the case falls far short of showing that it ever did in fact definitely locate any such line. It is not enough that the chief engineer of the road said in his report made to the company in May, 1874, that "the route of the road has been definitely fixed"; nor is it enough that the company, in its annual report made to the secretary of the interior under oath, for the year ending June 30, 1874, contained "a description of the line of route surveyed and fixed upon for construction." That annual report, like others of a similar character referred to in the record, was made under and pursuant to the provisions of section 13 of the granting act of March 3, 1871, which declares—

"That the president of the company shall annually, upon the first day of July, make a report and file it with the secretary of the interior, which report shall be under oath, respecting the financial situation of the company, the amount of money received and expended, and the number of miles of road constructed each year; and, further, the names and residences of the stockholders, of the directors, and of all other officers of the company; the amount of stock subscribed, the amount thereof actually paid in, a description of the lines of road surveyed and fixed upon for construction, the amount received from passengers and for freight, respectively, on the road; a statement of the expenses of said road, and its fixtures, and a statement of the indebtedness of said company, and the various kinds thereof."

The statement of an officer of a road that there has been a definite location of the line of the road authorized to be constructed does not establish the fact, in the absence of a statute attributing such effect to such a statement. In this case there is no such statute. Whether or not the line was definitely located is a question of fact to be determined from the evidence. It is not pretended that any map was ever filed by the Texas & Pacific Company in the general land office showing any such definite location. The line contended for on the part of the complainant was undoubtedly surveyed in the field and staked upon the ground; but there is not only no sufficient evidence of its adoption by the Texas & Pacific Company as its line of definite location (which term necessarily imports that it had passed beyond the power of the company to alter it in any respect), but the very resolution relied upon by the government as an adoption of the line as one of definite location upon its face shows that

it was subject to change by the company; for it, in terms, adopts it "with such modifications as in the judgment of the president may be to the best interests of the company."

And there is an abundance of other evidence going to show that the route of the Texas Pacific road never was definitely fixed. The surveys in the field by way of San Gorgonio Pass were made by Joseph U. Crawford, those by way of the Otay Valley (the direct line) by Engineer Reno, and those by way of Julian and Warner's Pass by Engineer Wood. Crawford's deposition was given in this suit in November, 1897, and in it he states that he made his surveys in the autumn of 1872; that he surveyed the line from Yuma to the summit of the San Gorgonio Pass, and from that summit down the San Jacinto, across the Temecula Plains to the cañon of that name, and thence down the coast to the Bay of San Diego, and "chained and staked it in order to obtain the topography, and in order to construct a profile and make a close estimate"; that, according to his recollection, he drove stakes every 200 feet on the desert, and every 100 feet on the grade; that he thereafter prepared "maps of different scales, and did all the necessary office work in order to get up a proper and reliable estimate," and turned them over to his superior officer, Maj. Evans, who had charge in California of all three of the surveying parties, and to whom Crawford, Reno, and Wood all reported the results of their surveys. The survey made by Crawford of the line now claimed on the part of the complainant to be that of definite location, it will be observed, was made in the fall of 1872,—the year preceding that in which the board of directors of the Texas Pacific Company adopted the route recommended by the chief engineer, "with such modifications as, in the judgment of the president, may be to the best interests of the company." That resolution was passed April 4, 1873. It is not claimed that there was any subsequent survey in the field of a route by way of San Gorgonio Pass. These facts are of themselves enough to show that the route by way of San Gorgonio Pass was never definitely fixed, which term, as has been said, imports that it is no longer subject to change by the company making it. The report made to the board of directors of the company by the chief engineer, upon which the above resolution was passed, was based upon the report to him of Maj. Davis, of February 3, 1873, with respect to the availability of the different routes through the mountains between Yuma and the Bay of San Diego. Being asked whether, from his knowledge of the topography and grades, that report was substantially correct, the witness Crawford answered:

"I don't think they had developed a practicable line, on what we called a 'direct line,' from San Diego to Fort Yuma along the southern boundary. Q. At that time, you mean? A. At that time, or even since. Q. Well, what do you say as to the estimates of Major Evans in that report as to measuring grades and altitudes against distances? A. I think that Major Evans' report, wherein he advised the adoption of the line by San Gorgonio Pass as being commercially the shorter line, and best for the company, was correct."

The witness Crawford further testifies that about the year 1877 he was asked by Mr. Bond, vice president of the Texas & Pacific

Company, to go to San Diego and try to reduce the quantities upon the direct line surveyed by Reno. "I went there," said the witness, "and reconnoitered the ground, organized a surveying party, and was in the field for two or three months,—as long as they would pay anything; and, as a result, I reported a very heavy reduction upon Reno's quantities upon the western slope of the Sierras upon the direct line. Frank Bond then communicated with General Dodge, and General Dodge sent Evans back to California to see me, and to see wherein this reduction could have been made, and whether he would acknowledge that I had improved upon the Reno survey, and I understood— I have not seen Evans' report to Bond and General Dodge, but I understand he acknowledged that I made a heavy reduction. On the strength of that, the people of San Diego appointed me, with David Felsenheld, as a committee; and I went to Washington in the winter of '77–'78, and appeared before the committee on the Pacific Railroad, and did all I could to get the direct line constructed. At that time, if my memory serves me, the Southern Pacific had constructed through San Gorgonio Pass." Certainly this very clearly shows that as late as 1877 the route of the Texas & Pacific Company had not been definitely fixed. The same fact is clearly shown by the following extract taken from the address of Mr. John C. Brown on February 22, 1876, before the committee of congress on the Texas and Pacific railroads; he being at the time vice president of the Texas & Pacific Company:

"I wish to state, in reply to Mr. Huntington, when he says that Colonel Scott two years ago declared that the road could not be constructed over the direct route from Yuma to San Diego, that we have since that time had skillful and intelligent engineers to go over that country, and they have explored cañons and passes not before examined by our engineers, and revised the former line; and they report that the direct line is entirely practicable, and that it can be built at much less cost than similar work done on the Southern Pacific or Central Pacific roads. We have a profile of the route, and the report of the engineer, and know certainly that we can build from Fort Yuma through to San Diego at a cost of less than $36,000 a mile on the average. There are 30 miles of this route which will be very expensive; some of it may cost $250,000 to $300,000 per mile; but the average will not exceed $36,000 per mile."

These facts, and others of a similar nature appearing in the record, make it perfectly clear that there never was any definite location of the Texas Pacific Railroad, and, as a consequence, that none of the lands in suit, covered by the grant of March 3, 1871, to the Southern Pacific Company, are excluded therefrom by reason of any definite location of the Texas & Pacific Company. That the piece of land claimed by the defendant Crawford was not subject to settlement by him in 1887 is shown by the case in this court of Railroad Co. v. Groeck (the opinion in which was filed April 3, 1899) 93 Fed. 707. That the lands patented to the defendant railroad company, and by it contracted to be sold and conveyed to the defendant Colorado River Irrigation Company, are protected by the confirmatory act of congress of March 2, 1896 (29 Stat. 42), supplementing that of March 3, 1887 (24 Stat. 556), is shown by the decisions of this court in the cases of U. S. v. Southern Pac. R. Co., 86 Fed. 962, and Id., 88 Fed. 832. That the defendant trustees of the Southern Pacific Company

have no greater rights in respect to the lands in suit than has that company is also shown by the decision in U. S. v. Southern Pac. R. Co., 86 Fed. 962, and cases there cited. A decree will be entered in accordance with the views above expressed.